Jason M. Ingber (SBN 318323)
**LEVI & KORSINSKY, LLP**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

[Additional counsel listed on signature page]

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

CORINNE PEARSON, LAURA WILLIS ALBRIGO, RICHARD HOOD, and ERIN WEILER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,

Defendant.

Case No.: '26CV6499 BJC BJW

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs Corinne Pearson, Laura Willis Albrigo, Richard Hood, and Erin Weiler ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Class Action Complaint against Defendant Royal Caribbean Cruises Ltd. ("Royal Caribbean" or "Defendant"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's browsing and search activity, website interactions, personal identifiers, and device identifiers strikes at the most basic expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. Royal Caribbean operates the website, https://www.royalcaribbean.com/ (the “Website”), through which users browse cruise itineraries, explore destinations and onboard experiences, customize travel plans, create and manage user accounts, make reservations and payments, access customer support services, and view promotional offers and travel-related content.

3. Like many modern websites, the Website displays a data privacy banner (the “Privacy Banner”) and a cookie preferences interface (the “Cookie Settings”) purporting to give users meaningful control over what data the Website shares with third parties.

4. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies (the “Tracking Tools”) capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings. The Tracking Tools transmit users’ data to the advertising, social media, and analytics companies that designed and operate them, TikTok, Meta, Google, Pinterest, Reddit, Snapchat, The Trade Desk, and Bazaarvoice (collectively, the “Tracking Entities”).

5. Moreover, users, including Plaintiffs, were misled by Defendant's Privacy Banner and Cookie Settings. The Website purports to let users manage their cookie preferences through the Privacy Banner and the Cookie Settings.

Specifically, users may click "Manage Preferences" on the Privacy Banner and, in the Cookie Settings, use the "Functional Cookies" and "Do Not Sell My Information" toggles and click "Confirm My Choices." Yet even after users affirmatively reject all unnecessary cookies, the Website continues to deploy cookies from Bazaarvoice, which transmits users' data in real time.

6. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes: webpages and products viewed or purchased; inferred interests, preferences, age, location, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; users' email addresses; and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information."

7. By misrepresenting both the effectiveness of its tracking mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

8. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, et seq.; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping); and common law, including invasion of privacy, intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiffs bring this action on behalf of themselves and a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1). This Court has supplemental jurisdiction over the non-federal claims in this action pursuant to 28 U.S.C. § 1367(a). This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

10. This Court has specific personal jurisdiction over Defendant. Defendant expressly aimed its conduct at California by knowingly intercepting and collecting the communications of California users, including Plaintiffs, while they were in California, and Plaintiffs' claims arise out of and relate to that conduct. Defendant also regularly conducts business in California and maintains operations at California ports. Having knowingly collected California residents' data, Defendant cannot claim surprise at being haled into a California court to answer for it.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here. Two Plaintiffs reside in this District, accessed the Website from this District, and had their communications intercepted and transmitted to the Tracking Entities while located here. Venue is also proper under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Defendant is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## PARTIES

12. Plaintiff Corinne Pearson is, and at all relevant times has been, a citizen and resident of California. Plaintiff Pearson accessed and used Defendant's Website while physically located in California. In connection with her visit to Defendant's Website, Plaintiff Pearson engaged with Defendant's Cookie Settings and declined all but strictly necessary Tracking Tools, relying on Defendant's representations that such selection would disable marketing and tracking technologies.

13. Plaintiff Laura Willis Albrigo is, and at all relevant times has been, a citizen and resident of California. Plaintiff Albrigo accessed and used Defendant's Website while physically located in California. In connection with her visit to Defendant's Website, Plaintiff Albrigo engaged with Defendant's Cookie Settings and declined all but strictly necessary Tracking Tools, relying on Defendant's representations that such selection would disable marketing and tracking technologies.

14. Plaintiff Richard Hood is, and at all relevant times has been, a citizen and resident of California. Plaintiff Hood accessed and used Defendant's Website while physically located in California. In connection with his visit to Defendant's Website, Plaintiff Hood engaged with Defendant's Cookie Settings and declined all but strictly necessary Tracking Tools, relying on Defendant's representations that such selection would disable marketing and tracking technologies.

15. Plaintiff Erin Weiler is, and at all relevant times has been, a citizen and resident of California. Plaintiff Weiler accessed and used Defendant's Website while physically located in California. In connection with her visit to Defendant's Website, Plaintiff Weiler engaged with Defendant's Cookie Settings and declined all but strictly necessary Tracking Tools, relying on Defendant's representations that such selection would disable marketing and tracking technologies.

16. Defendant Royal Caribbean Cruises Ltd. is a corporation organized under the laws of the Republic of Liberia, with its principal place of business at 1050 Caribbean Way, Miami, Florida 33132. Defendant owns, operates, and controls the Website.

## FACTUAL ALLEGATIONS

### A. Plaintiffs' Experiences on the Website

17. Plaintiff Pearson visited Defendant's Website on September 14, 2026, as well as in or around February 2026. During her most recent visit, Plaintiff Pearson reviewed cruise offerings available on the Website and compared various travel destinations and prices. Plaintiff Pearson does not maintain an account with Defendant and has never booked a trip or otherwise made any purchases from Defendant. Plaintiff Pearson consistently declines the use of cookies and tracking technologies on all websites she visits as a matter of personal-privacy practice. As stated above, Plaintiff Pearson engaged with the Website's Cookie Settings and declined all but necessary cookies during her visits to Website. Plaintiff Pearson accessed the Website while logged into her Facebook account and other social media platforms on the same browser and reasonably believed that by rejecting all non-required Tracking Tools and tracking technology, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

18. Plaintiff Albrigo visited the Website in or about August 2026. During that visit, Plaintiff Albrigo reviewed cruise offerings for Alaska and Mexico available on the Website in contemplation of booking a trip. Plaintiff Albrigo does not maintain an account with Defendant and has never booked a trip or otherwise made any purchases from Defendant. Plaintiff Albrigo consistently declines the use of cookies and tracking technologies on all websites she visits as a matter of personal-privacy practice. As stated above, Plaintiff Albrigo engaged with the

Website's Cookie Settings and declined all but necessary cookies during her visits to Website. Upon information and belief, Plaintiff Albrigo accessed the Website while logged into her Facebook account and other social media platforms on the same browser and reasonably believed that by rejecting non-required Tracking Tools, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

19. Plaintiff Hood visited the Website in or about July 2026 to research how to effectively unsubscribe from email communications and look up cruises in Mexico. Plaintiff Hood has previously visited the Website within the last two years to research cruise offerings, drink packages and amenities. Plaintiff Hood maintains an account with Defendant as a Loyalty Member but has never booked a trip or otherwise made any purchases from Defendant. Plaintiff Hood consistently declines the use of cookies and tracking technology on all websites he visits as a matter of personal-privacy practice. As stated above, Plaintiff Hood engaged with the Website's Cookie Settings and clicked "X" on the Privacy Banner, believing that doing so constituted a rejection of all but necessary Tracking Tools. Plaintiff Hood accessed the Website while logged into his Facebook account on the same browser and reasonably believed that by rejecting non-required Tracking Tools, his browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

20. Plaintiff Weiler visited the Website in or about March and April 2026. During that visit, Plaintiff Weiler reviewed various cruise offerings available on the Website and searched for cruises departing from Los Angeles and Miami. Plaintiff Weiler maintains an account with Defendant but has never booked a trip or otherwise made any purchases from Defendant. Plaintiff Weiler consistently declines the use of cookies and tracking technology on all websites she visits as a matter of personal-privacy practice. As stated above, Plaintiff Weiler engaged with

the Website's Cookie Settings and declined all but necessary cookies during her visits to Website. Upon information and belief, Plaintiff Weiler accessed the Website while logged into her Facebook Account on the same browser and reasonably believed that by rejecting non-required Tracking Tools, her browsing activity would not be tracked beyond what was strictly necessary for the Website's basic functionality.

**B. How Websites Function**

21. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

22. When a user navigates to a webpage, by entering a URL directly or clicking a hyperlink, that user's browser contacts a Domain Name System ("DNS") server, which translates the website's web address into a unique Internet Protocol ("IP") address.[1]

23. An IP address is "a unique address that identifies a device on the internet or a local network."[2]

24. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

25. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to

---

[1] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Nov. 2, 2026).

[2] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Nov. 5, 2026).

transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

26. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

27. Website owners and web developers write and manage the URLs for their websites.

28. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is processed by the browser as it arrives[3] and rendered into the visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.[4]

29. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[5]

---

[3] This processing of webpage data as it arrives is called "parsing," and allows web browsers to convert raw data received over the internet into structured data objects used by the renderer built-in to the browser to create images on the screen. This means that, unless a software command, like a Tracking Tool, is physically last to arrive at a device, it is loaded and executed before the communication has finished being received. *See Parse*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/Parse (last visited Nov. 2, 2026).

[4] *See How the Web Works*, *supra* note **Error! Bookmark not defined.**.

[4] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Nov. 5, 2026).

[5] *See JavaScript: Adding interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Nov. 5, 2026).

30. Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

31. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

**C. Defendant Programmed the Website To Identify and Track Users**

32. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both the Defendant and the Tracking Entities.

33. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for or even hover over.

34. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case,

Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

35. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

36. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

37. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

38. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiffs, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

39. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

**D. The Website Misrepresented That Users Could Control the Collection and Disclosure of Their Sensitive Information**

40. Defendant displayed a Privacy Banner and Cookie Settings on the Website. The Privacy Banner and Cookie Settings represented that users could make material choices about what tools were used on the website and how their data was shared with third parties. Plaintiffs relied on these representations using the Website. However, these representations were materially false and misleading.

41. When users visited the Website, the Website immediately displayed a Privacy Banner stating: "We use cookies, pixel tags and other technologies to collect information you provide as well as information about your interactions with our site to enhance user experience. We also share information about your use of our site with our social media, advertising and analytics partners. By using this site, you consent to our use of these tracking tools in accordance with our Privacy Notice and you accept our Terms of Use." The Privacy Banner provided users with options to click "Manage Preferences" or "×".

42. After users clicked "Confirm My Choices" in the Cookie Settings, the Cookie Settings disappeared from view.




*Figure 1 – Privacy Banner of Royal Caribbean's Website representing a cookie preferences interface to purportedly allow users to "[m]anage [p]references."*

43. Website users who selected "Manage Preferences" on the Privacy Banner were presented with the Cookie Settings, headed "Manage Consent Preferences", which represented that users could control how their Sensitive Information was collected and shared by accepting only "Required Cookies."




*Figure 2 – Cookie Settings representing users with an option of disabling the selling of user information and targeted advertising*




*Figure 3 - Screen capture as of Dec. 4, 2025, depicting the automatically enabled tracking system*

44. Defendant's Cookie Settings state that:

> In these instances, We provide you the opportunity to disable such Cookies via the Cookie Preferences herein. *See* our Privacy Notice for more details on Cookies, the sale and sharing of personal information, including targeted advertising, under United States state laws and other options to disable Cookies.
>
> We categorize the Cookies We use based on how they function. Below you will find the categories of Cookies and a brief description. With the exception of Required Cookies, you may opt out of individual categories of Cookies using the toggle next to each category and/or the sale/sharing of personal information by using the DO NOT SELL/SHARE MY PERSONAL INFORMATION toggle.

45. Furthermore, the Cookie Settings state that users can decline cookies other than Required Cookies:

Required Cookies
Always Active
Functional Cookies
Do Not Sell My Information
Confirm My Choices
Allow All

46. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiffs, and would reasonably lead all Website users similarly situated, to believe that they had disabled all but Required Cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiffs and all reasonable users to believe that Defendant would not allow Tracking Entities, through cookies or similar technologies, to access users' Sensitive Information. Plaintiffs acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of their Sensitive Information and use of any Tracking Tools other than essential cookies.

47. However, Defendant did not abide by Plaintiffs' expressed preferences and does not abide by users' expressed preferences. When users choose to decline all cookies other than Required Cookies, they clearly communicate that they do not consent to the placement or transmission of cookies other than those required for functionality. Nevertheless, Defendant continued to cause cookies from Bazaarvoice to be placed or otherwise accessed on users' browsers and devices so that Bazaarvoice could intercept, transmit, and use users' Sensitive Information in real time.

**E. Defendant's Website Uses Tracking Tools**

48. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information in real time as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

49. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiffs' Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view a product, or load any page on the Website.

50. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiffs, when they visit the Website, including users who never made an account or purchase on the Website. The cookies allow the Tracking Entities to identify users, including the Plaintiffs, when they visit the Website or any other website where the Tracking Tools are present.

51. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiffs' Sensitive Information. Defendant uses Plaintiffs' Sensitive Information to improve their marketing and advertising, while the Tracking Entities use Plaintiffs' Sensitive Information for marketing and advertising on the Website and other third-party websites, improve their own services, including enhancing the algorithms used to build their Tracking Tools, and to build personal profiles to advertise to users, including Plaintiffs.




*Figure 4 – Sample product on the Website*

## F. The Meta Pixel

52. Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc., offers its own tracking pixel (the "Meta Pixel") to website owners for the purpose of monitoring user interactions on their websites, which can then be shared with Meta.

53. The Meta Pixel is a marketing tool that can only be added to a webpage by website developers.[6] A website operator must sign up for a business account or link a related Facebook account with the Meta Pixel and then add code to the website to make use of the Meta Pixel.[7]

---

[6] *See Set Up and Install the Meta Pixel*, META, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Nov. 2, 2026).
[7] *See id.*

54. Upon creating a Meta Pixel, a Pixel ID (also called a DataSet ID by Meta) is generated.[8] This Pixel ID is used to initialize the Meta Pixel, either by allowing Meta to fetch a predetermined library of code related to that ID, or otherwise by identifying the website owner's Facebook account used to receive the collected data when programming the Meta Pixel directly into a website.[9]

55. This Pixel ID must match a known Pixel ID in Meta's system, and is transmitted by the Meta Pixel.[10]

56. As Meta notes, the Meta Pixel must be added to each individual page that a website owner wishes to be tracked.[11]

57. Defendant employs the Meta Pixel to gather, collect, and then share user information with Meta.[12] Defendant and Meta use this information to build valuable personal profiles for Website users to inform their targeted advertising campaigns, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[13]

---

8 *See Get Started with the Meta Pixel*, META (updated June 30, 2026), https://developers.facebook.com/docs/meta-pixel/get-started/ (last visited Nov. 2, 2026).

9 *See id.* ("To install the Pixel, we highly recommend that you add its base code . . . on every page where you will be tracking website visitor actions.").

10 *See id.*

11 *See id.* ("To install the Pixel, we highly recommend that you add its base code . . . on every page where you will be tracking website visitor actions.").

12 *See id.* The Meta Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Meta. *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 2, 2026).

13 *See Meta Pixel*, META (last updated Nov. 15, 2023), https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 27, 2026).

58. The harvested data improves Defendant's advertising by pinpointing audience demographics by interests, gender, or location, and finding the people who are most likely to take action and/or view content.[14]

59. Once implemented on a website, the Meta Pixel begins to share users' information the moment a user lands on the website.

60. When a Facebook account holder logs on to Facebook, tracking cookies, including the "c_user" cookie, the data cookie, and the "fr" cookie, are automatically created and stored on the user's device.[15] These cookies allow Meta to link the data it receives through the Meta Pixel to individual Facebook account holders.

61. The c_user cookie, for example, contains a series of numbers (the user's Facebook ID, or "FID") to identify a user's profile.




*Figure 5 – Sample c_user cookie, containing FID of test account created by Plaintiffs' counsel to investigate the Meta Pixel*

62. The FID can simply be appended to www.facebook.com/ to navigate to the user's profile (e.g., www.facebook.com/[FID]). Appending the FID from Figure 5 to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) redirects the webpage straight to the Facebook account associated with the FID, as depicted below:

---

[14] *See Meta Advantage+ Audience: Target Ad Campaigns with AI*, META, https://www.facebook.com/business/ads/meta-advantage-plus/audience (last visited Nov. 2, 2026).

[15] *See Cookies Policy: What Are Cookies, and What Does This Policy Cover?*, META (last updated Dec. 12, 2023), https://www.facebook.com/policy/cookies/ (last visited Nov. 2, 2026).




*Figure 6 – Sample Facebook account created by Plaintiffs' counsel to investigate the Meta Pixel, with FID highlighted in URL*

63. The Meta Pixel tracks user-activity on web pages by monitoring events,[16] which, when triggered, causes the Meta Pixel to automatically send data, users' Sensitive Information, directly to Meta.[17] Examples of events utilized by websites include a user loading a page with the Meta Pixel installed (the "PageView event");[18] The Website utilizes this PageView event.[19]

64. Defendant also uses the Meta Pixel to transmit its unique Pixel ID via the "id" parameter, which contains Defendant's Pixel ID of "849036455146071."

65. Defendant uses the Meta Pixel to monetize their Website users' Sensitive Information.

---

[16] *See About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Nov. 2, 2026).

[17] *See id.*

[18] *See Specifications for Meta Pixel Standard Events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Nov. 2, 2026).

[19] The presence of Pixel events can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About Meta Ads Data Advisor*, META, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Nov. 2, 2026).

66. Meta independently benefits from the data collected through the Meta Pixel by using the harvested data to sell targeted advertising services. Meta uses consumers' Sensitive Information to refine its marketing algorithms, profiting from the ability to more accurately target potential customers.

67. Defendant's use of the Meta Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to purchasing the sample product on the Website from Figure 4.




*Figure 7 – Meta Pixel tracking a user landing on the webpage from Figure 4 through the "PageView" event*

68. When a business applies to use the Meta Pixel, it is provided with details about its functionality and its impact on private information.[20] However, Plaintiffs and those similarly situated are not provided this information and would have no reason to look for it, as they are not a party to Defendant's agreement with Meta.

69. To make use of the Meta Pixel, Defendant agreed to Meta's Business Tools Terms (the "Meta Terms").

70. The Meta Terms inform website owners using Meta's Pixel that the employment of the Meta Pixel will result in data sharing, including with Meta, through the automatic sharing of Meta Pixel "Event Data" and "Contact Information."[21]

71. The Meta Terms are transparent that Meta will use the Pixel Event data and Contact Information "to match the contact information against user IDs ('**Matched User IDs**'), as well as to combine those user IDs with corresponding Event Data."[22]

72. Meta directs parties implementing the Meta Pixel, here, Defendant, to encrypt request information[23] *before* data can be shared.[24]

---

[20] *See Get Started with the Meta Pixel*, *supra* note 8 (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited.").

[21] *See Meta Business Tools Terms*, FACEBOOK (last updated Nov. 3, 2025), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGodnMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited Nov. 2, 2026).

[22] *Id.* (bolding in original).

[23] This contrasts with Meta's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Meta Pixel method, which makes users' information visible. *See id.*

[24] *See id.*

73. Meta further provides Meta Pixel users, such as Defendant, guidance on responsible data handling and details how data is acquired, used, and stored, including which information is shared with Meta.

74. Meta educates or reminds Meta Pixel users of their responsibility to inform their users of their website's data sharing and specifically guides website owners to obtain the requisite rights, permissions, or consents before sharing information with any third party.[25]

75. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Meta Pixel and ignored Meta's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**G. The Reddit Pixel**

76. Additionally, Defendant has installed a tracking pixel on its Website created by social media platform Reddit (the "Reddit Pixel").

77. The Reddit Pixel is a piece of code that can be added to a website by a website owner to track users on the website and record the actions the visitors take.[26] The harvested data is subsequently used by the website owner to serve targeted ads to website users on Reddit.

78. The Reddit Pixel is also used in conjunction with Reddit's Conversion API to track specific actions that users take on the websites, such as

[25] *See Privacy and Data Use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Nov. 2, 2026).

[26] *See About the Reddit Pixel*, REDDIT, https://business.reddithelp.com/s/article/reddit-pixel (last visited Nov. 3, 2026).

viewing a page, submitting a search in the website's search bar, adding a product to the visitor's cart, checking out, and other specified events.[27]

79. Reddit makes use of a website owner's pixel ID to determine which data should be tracked when sending the code for the Pixel to the user's browser,[28] and to specify "which business account should receive" the user's tracking data.[29]

80. With respect to Defendant's use of the Reddit Pixel, Defendant configured the Reddit Pixel to include a parameter called "id," which identifies Defendant's Reddit Pixel ID as "t2_dygg9tbf." This data is sent both when receiving communications from the Website and as users send communications to the Website.

81. Website owners, like Defendant, can enable a feature of the Reddit Pixel known as "Auto-Advanced Matching" to determine the exact identity of Reddit users who visit the website.

82. Auto-Advanced Matching automatically scrapes a website for any email addresses typed or inserted by a user and sends that email information to Reddit.[30]

---

[27] *See Conversion Events*, REDDIT, https://business.reddithelp.com/articles/Knowledge/supported-conversion-events (last visited Nov. 3, 2026).

[28] *See Install the Reddit Pixel Directly*, REDDIT, https://business.reddithelp.com/s/article/Install-the-Reddit-Pixel-on-your-website (last visited Nov. 3, 2026).

[29] *About the Reddit Pixel*, *supra* note 26.

[30] *See Auto-Advanced Matching*, REDDIT, https://business.reddithelp.com/s/article/automated-advanced-matching (last visited Nov. 3, 2026).

83. In addition to email addresses, a website owner can enable the Reddit Pixel and the Conversion API to send additional Sensitive Information to Reddit, known as "match keys," to further identification of website users.[31]

84. IP addresses are match keys that website owners are *required* to send to Reddit. Website owners and Reddit may also use other match keys including:

a. Email addresses;

b. Phone numbers;

c. Mobile Advertising IDs (a unique identifier for a mobile user);

d. Reddit Click IDs (to attribute click conversions more accurately);

e. External IDs (an advertiser-assigned identifier that enhances match accuracy);

f. Reddit UUIDs (a unique ID generated by the Reddit Pixel);

g. User Agents (which identify the software the user is using to access the website); and

h. The visitor's screen dimensions.[32]

85. This data can be used by Reddit to match an otherwise anonymous website visitor to their Reddit account, or even to identify them outright, associating their identity with their activity on a website.

86. Reddit uses this data to help advertisers, including Defendant, gauge the effectiveness of their ad campaigns, improve their ability to attribute activity to specific ad campaigns, track users across devices, and help them create more precisely targeted ad campaigns.[33]

---

[31] *See About Match Keys*, REDDIT, https://business.reddithelp.com/s/article/about-match-keys#customer-match-keys-and-identifiers (last visited Nov. 3, 2026).
[32] *See id.*
[33] *See id.*

87. Additionally, Reddit employs this data to optimize its own ad placements and to develop new services.[34]

88. Defendant's use of the Reddit Pixel on the Website is demonstrated by the screenshots below, which follow a user's journey to searching for and purchasing a product on the Website.




*Figure 8 – Reddit Pixel tracking a user visiting the webpage from Figure 4 through the "PageVisit" event*

89. To utilize the Reddit Pixel, Defendant agreed to Reddit's Business Tool Terms (the "Reddit Terms").

90. The Reddit Terms inform website owners, such as Defendant, that the employment of the Reddit Pixel will result in data sharing, including with Reddit,

[34] *See Reddit Privacy Policy*, REDDIT (last updated May 26, 2026), https://www.reddit.com/policies/privacy-policy (last visited Nov. 3, 2026).

of users' Sensitive Information, including website actions, email addresses, cookie IDs, and device IDs, among other "matching parameters."[35]

91. The Reddit Terms make clear that the onus is on Defendant to provide all necessary transparency notices and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with Reddit.

92. The Reddit Terms explicitly condition the use of the Reddit Pixel on website owners' warranties that they: (i) "prominently disclose [] and obtain any legally required consent from users" regarding the Reddit Pixel's data sharing; (ii) provide "clear, prominent, and legally sufficient instructions regarding how to opt out of such data collection and use;" and (iii) do not share "any data related to users who have not provided consent."[36]

93. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Reddit Pixel, and ignored Reddit's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private information.

**H. The TikTok Pixel**

94. TikTok offers software known as a "tracking pixel" to track users' actions, behavior, and conversions across the Website (the "TikTok Pixel").

95. The TikTok Pixel is a snippet of code that begins to collect user information the moment a user lands on the Website, before Defendant's Cookie Settings advise the user of the invasion or seeks their consent. To use the TikTok Pixel, website operators must include the specific pixel IDs associated with their

---

[35] *See Reddit Business Tool Terms*, REDDIT (last updated July. 7, 2025), https://business.reddithelp.com/s/article/Reddit-Business-Tool-Terms (last visited Nov. 3, 2026).

[36] *Id.*

websites, which allows TikTok to link the collected data back to their individual TikTok business profiles.[37]

96. Defendant's TikTok Pixel ID is included in transmissions sent to and from Plaintiffs' devices, as seen in Figures 10 and 11, the TikTok javascript code in Figure 10 references Defendant's Pixel ID, whereas the "code" variable in Figure 11 identifies the TikTok Pixel ID, both of which reference the Pixel ID as "CBCQ78JC77UEDSB458IG".

97. TikTok Pixel users make use of events to collect even more specific data on users' activities, including for the actions taken on a webpage (e.g., clicking a specific button or element, adding an item to a cart, and when a webpage with a URL containing a specified keyword is loaded onto a user's browser), the value of the purchase, and the product purchased.[38]

98. These event-triggers cause data to be sent as communications are received by users (through webpage loading events), and as communications are sent to the Website (through button clicking and similar events).

99. The TikTok Pixel also collects:

a. The time website actions took place;

b. The IP address (which is used to determine the geographic location of a user);

c. Device information, including make, model, operating system, and browser information;

---

[37] *See generally Troubleshoot with Pixel Helper*, TIKTOK ( last updated Feb. 2025), *https://ads.tiktok.com/help/article/tiktok-pixel-helper-2.0?lang=en* (last visited Nov. 2, 2026), (noting that a missing or invalid Pixel ID will cause errors when using the TikTok Pixel).

[38] *See generally About TikTok Pixel*, TIKTOK (last updated June 2026), https://ads.tiktok.com/resources/help/article/tiktok-pixel?lang=en (last visited Nov. 2, 2026); *Troubleshoot with Pixel Helper*, *supra* note 37.

d. Cookies that can be used to identify users; and

e. Metadata and button clicks.[39]

100. The information the TikTok Pixel collects provides Defendant and TikTok with a better understanding of who Defendant's customers are and how they navigate around the Website.

101. TikTok's "Advanced Matching" features allows Defendant to "match customer information such as email, phone number, and other identifiers with actions people take on [the Website]."[40] Once Advanced Matching is active, the TikTok Pixel "will automatically find customer information and match it with people on TikTok."[41] TikTok then provides Defendant with custom audiences based on website user events, like page views or purchases, to model lookalike audiences.[42] Lookalike audiences allow Defendant to retarget users who have already visited or made purchases on the Website and serve them with relevant ads on TikTok based on how they interacted with the Website.[43]

102. Put simply, the TikTok Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data

---

[39] *See About TikTok Pixel*, *supra* note 38.

[40] *About Advanced Matching for Web*, TIKTOK (last updated Sept. 2025), https://ads.tiktok.com/help/article/advanced-matching-web?lang=en (last visited Nov. 2, 2026).

[41] *How to Set Up Automatic Advanced Matching*, TIKTOK (last updated Nov. 2025), https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en (last visited Nov. 2, 2026).

[42] *See Get Started with the TikTok Pixel: A Small Business Guide*, TIKTOK, https://ads.tiktok.com/business/en-US/blog/get-started-with-tiktok-pixel (last visited Nov. 2, 2026) (benefits of using the TikTok Pixel).

[43] *See* Lizzie Davey, *How to Use TikTok Pixel: TikTok Conversions Tracking*, LEADSBRIDGE (May 2, 2025), https://leadsbridge.com/blog/tiktok-pixel/ (last visited Nov. 2, 2026).

TikTok has acquired and accumulated about hundreds of millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.[44]

103. Defendant used the TikTok Pixel to monitor and log, in real time, when users clicked on specific products, loaded webpages, added specific products to cart, and proceeded through the checkout process to payment and shipping.

104. The TikTok Pixel also captures users' identifying cookies (the _ttp cookie is used to identify TikTok users).[45]

105. Using the TikTok Pixel benefits Defendant by allowing Defendant to effectively track conversions, optimize the delivery of its ad campaigns, create and target its own custom audiences, and access tons of data to run successful ad campaigns.[46]

106. TikTok benefits, in turn, by using data collected by the TikTok Pixel to improve its own products and services and to generate its own benchmarking reports to share with other TikTok business customers.[47]

107. According to a leading data security firm, the TikTok Pixel secretly installed on Defendant's Website is particularly invasive. The TikTok Pixel "immediately link[s] to data harvesting platforms that pick off usernames and passwords, credit card and banking information and details about users' personal

---

[44] *See id.*

[45] *See List of Cookies*, G-STAR RAW 13 (March 2023), https://assets.g-star.com/v1/static/Cookielist_Jun_2022#:~:text=Tiktok%20tta_attr_id.%2012%20months%20This%20cookie%20is,measure%20how%20different%20campaigns%20and%20marketing%20strategies (last visited Nov. 2, 2026).

[46] *See Get Started with the TikTok Pixel: A Small Business Guide*, *supra* note 42.

[47] *See TikTok Business Products (Data) Terms*, TIKTOK (last updated Jan. 22, 2026), http://ads.tiktok.com/i18n/official/policy/business-products-terms (last visited Nov. 2, 2026).

health."[48] The TikTok Pixel also collects "names, passwords and authentication codes" and "transfer[s] the data to locations around the globe," and does so "before users have a chance to accept cookies or otherwise grant consent."[49]

108. An image of the invasive TikTok code secretly embedded on Defendant's Website can be seen here, which shows the Website instantly sending communications to TikTok to add to its collection of user behavior:




*Figure 9 – Using a browser's "developer tools" on Royal Caribbean's webpage shows the Website loading TikTok Pixel's code onto the user's browser*

[48] Aaron Katersky, *TikTok Has Your Data Even If You've Never Used The App: Report*, ABC NEWS (Mar. 16, 2023 1:59 PM), https://abcnews.go.com/Business/tiktok-data-app-report/story?id=97913249 (last visited Nov. 12, 2026).

[49] *Id.*




*Figure 10 – Defendant's TikTok Pixel code on the Website displaying the active features of the TikTok Pixel on the Website*

109. The Website instantly sends communications to TikTok when a user views the page and tracks page interactions. The screenshots below show the sample webpage along with the webpage code including the various TikTok scripts Defendant runs, and the electronic impulses sent to TikTok to add to their collection of user behavior:




*Figure 11 – Information collected via the TikTok Pixel when a user visits the sample webpage from Figure 4*

110. To use the TikTok Pixel, Defendant agreed to TikTok's Business Products (Data) Terms (the "TikTok Terms"). However, Plaintiffs and those similarly situated are never exposed to these terms (nor would they have any reason to look for them) as they form the agreement between Defendant and TikTok, which agreement is not even known to Plaintiffs and Website users.

111. The TikTok Terms inform website owners using the TikTok Pixel, such as Defendant, that their use of the TikTok Pixel shares or enables TikTok to access their website users' contact details, developer data, and/or event data.[50]

112. The TikTok Terms are transparent that TikTok will process users' data to match contact details against corresponding accounts and subsequently match those accounts with the users' corresponding event data.[51]

[50] *See TikTok Business Products (Data) Terms*, *supra* note 47.

[51] *See id.*

113. TikTok obligates TikTok Pixel users, such as Defendant, that they "must only share with us or enable us to access Business Products Data in a manner that is transparent and lawful."[52] TikTok makes clear that the onus is on Defendant to provide all necessary transparency notices, and obtain all necessary rights, permissions, and lawful bases, including consent, to share information with TikTok.

114. TikTok educates or reminds TikTok Pixel users of their obligation not to share any data "from or about Children or that includes health or financial information, or other categories of sensitive information."[53]

115. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the TikTok Pixel and ignored TikTok's warnings to safely handle its users' data and warn their users that the Website would disclose their Sensitive Information in a manner that impinges upon their privacy.

**I. Google DoubleClick**

116. Google's tracking tools are not implemented into websites by Google but require several affirmative steps on the part of the website owner to implement and to effectuate their data sharing.

117. DoubleClick for Publishers ("DoubleClick"), now known as Google Ad Manager,[54] allows website owners to connect with other website owners to buy ad space within other websites and allows website owners to track the performance

[52] *Id.*
[53] *Id.*
[54] *See* Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (last updated Oct. 8, 2026), https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited Nov. 2, 2026) ("While [DoubleClick for Publishers ("DFP")] was rebranded as Google Ad Manager (GAM) several years ago, it is often still referred to as DFP within the ad tech industry.").

of their ads across websites.[55] DoubleClick "acts as a liaison between a [website owner's] ad inventory, relevant ad networks," and website owners that are "looking to purchase ad space on a website."[56]

118. DoubleClick works in a similar way to Google Ads and Google AdSense in that it allows companies to buy impressions through the DoubleClick Ad Exchange.[57] A DoubleClick account requires the use of a corresponding Google AdSense account.[58]

119. The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[59] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved; (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[60]

120. Defendant sends Website users' Sensitive Information, such as search terms and queries, to Google via the URL ad.doubleclick.net as depicted below:

---

[55] *See* Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP BY GENIEE (Dec. 10, 2022), https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited Nov. 2, 2026).

[56] Munro, *supra* note 54.

[57] *See The DoubleClick Ad Exchange*, GOOGLE, https://static.googleusercontent.com/media/www.google.com/en//adexchange/AdExchangeOverview.pdf (last visited Nov. 2, 2026).

[58] *See* Grover, *supra* note 55.

[59] *See* Munro, *supra* note 54.

[60] *See* Deepak Sharma, *Google AdSense vs Ad Exchange: A Detailed Comparison for Smarter Monetization*, ADPUSHUP BY GENIEE (Mar. 6, 2025), https://www.adpushup.com/blog/adsense-vs-ad-exchange/ (last visited Nov. 3, 2026).




*Figure 12 – Using the Website's Search Bar results in DoubleClick intercepting and obtaining search terms*

121. The bidding system is similar to the Google Ads system. The benefits provided to Google from DoubleClick Ads are also similar to those provided by Google's search ads. First, Google Ad Manager has various fee structures that can be utilized including a percentage of spend plus a flat monthly fee; a flat monthly fee or percentage of spend, whichever is higher or a flat fee percentage based on the amount you spend every month.[61] Regardless of the structure, Google earns revenue from allowing website owners to utilize its code to display ads purchased from the DoubleClick Ad Exchange.

122. As explained above, AdSense ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as

[61] *See* Joe Balestrino, *How Much Does Google Ads Management Cost?*, JOE BALESTRINO (Feb. 17, 2023), https://www.joebalestrino.com/how-much-does-google-ads-management-cost (last visited Nov. 3, 2026).

Defendant, can receive 80 percent of the revenue after the advertiser platforms takes its fee.[62]

**J. The Pinterest Tag**

123. Defendant has also installed a tracking pixel on its Website created by social media site, Pinterest (the "Pinterest Tag").

124. The Pinterest Tag is a piece of code that can be added to a website by a website owner to track visitors on the website and record the actions they take in order to later target these visitors with ads on Pinterest.[63]

125. To make use of the Pinterest Tag, a website owner must include its Pinterest tag ID in its base code.[64]

126. The Pinterest tag ID identifies which code needs to be sent to the user's browser to track website owner-designated data points through specified "events."[65]

127. Once a website owner adds the base code of the Pinterest Tag, website owners can add "event codes" so the Pinterest Tag tracks specific actions that visitors take on their websites, such as viewing a page, viewing a video, checking out, and other specified events.[66]

---

[62] *AdSense Revenue Share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited Nov. 3, 2026).

[63] *See Install the Pinterest Tag*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-pinterest-tag (last visited Nov. 3, 2026).

[64] *See Add the Base Code to Your Website*, PINTEREST, https://help.pinterest.com/en/business/article/install-the-base-code (last visited Nov. 3, 2026).

[65] *See Add Event Codes*, PINTEREST, https://help.pinterest.com/en/business/article/add-event-codes (last visited Nov. 3, 2026).

[66] *See id.*

128. The Pinterest Tag begins intercepting user information as soon as the Pinterest Tag loads onto users' browsers.[67]

129. Website owners like Defendant then send the collected information to Pinterest. Pinterest recommends that website owners transmit the IP address of website visitors for all conversion events.[68]

130. Without the implementation of any other features, the Pinterest Tag tracks and transmits the URL currently being viewed by the website visitor. Additionally, the Pinterest Tag reads and uses first-party cookies to identify the Pinterest user currently viewing the website through a personalized Pinterest "User ID," even when the user is logged out of Pinterest.[69]

131. Website owners can also, in conjunction with the Pinterest Tag, enable a feature known as "automatic enhanced match" to determine the exact identity of Pinterest users who visit the website.[70]

132. When used in conjunction with automatic enhanced match, the Pinterest Tag collects and transmits to Pinterest the following user data:

---

[67] *See Track Conversions with Pinterest Tag*, PINTEREST, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (last visited Nov. 3, 2026).

[68] *See Track Conversion Events in the API*, PINTEREST, https://developers.pinterest.com/docs/api-features/track-conversion-events/ (last visited Nov. 3, 2026).

[69] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Nov. 3, 2026).

[70] *See Enable Automatic Enhanced Match*, PINTEREST, https://help.pinterest.com/en/business/article/automatic-enhanced-match (last visited Nov. 3, 2026).

a. Email addresses;

b. First and last names;

c. Phone numbers;

d. Genders;

e. Birth dates;

f. External IDs; and

g. Address location information such as city, state, zip code, and country.[71]

133. This data can be used by Pinterest to "match more of [a] website['s] visitors and conversions to people on Pinterest, which can lead to improvements in [ad] campaign performance . . . and audience reach." [72]

134. Pinterest uses this data to help advertisers like Defendant gauge the effectiveness of their ad campaigns, optimize the return on their ad spending, and broaden their audience reach.[73]

135. The Pinterest Tag also sends the "tid" parameter, which identifies the website owner's Pinterest Tag ID.[74] Here, the "tid" parameter in Pinterest Tag transmissions from Defendant's site contains Defendant's Pinterest tag ID of 2612497056198. This data is sent both when receiving communications from the Website and as users send communications to the Website.

136. Additionally, unless websites make use of a specific "limited data processing flag," Pinterest employs this data, such as names, phones numbers,

---

[71] *See id.*
[72] *Id.*
[73] *See id.*
[74] *See View Tag Parameters and Cookies*, PINTEREST, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last visited Nov. 3, 2026).

emails and IP addresses, to conduct research on Pinterest usage and to market its own services.[75]

137. Pinterest also sends the data to its business partners and other vendors.[76]

138. Defendant's use of the Pinterest Tag on the Website is demonstrated below:




*Figure 13 – Pinterest Tag tracking a user landing on the webpage for the sample product from Figure 4 through the "pagevisit" event*

139. When a website owner applies with Pinterest to use the Pinterest Tag, the website owner must agree to Pinterest's Developer and API Terms of Service

---

[75] *See Limited Data Processing*, PINTEREST, https://help.pinterest.com/en/business/article/limited-data-processing (last visited Nov. 3, 2026).

[76] *See State Privacy Law Disclosures and Notice at Collection*, PINTEREST (last updated Apr. 2025), https://policy.pinterest.com/en/notice-at-collection (last visited Oct. 20, 2026).

(the "Pinterest Terms"), part of which requires agreeing that Pinterest may collect and use website users' information.[77]

140. The Pinterest Terms further provide Pinterest Tag users, like Defendant, guidance on their responsibilities regarding privacy.

141. Pinterest directs parties implementing the Pinterest Tag, such as Defendant, to clearly disclose its data practices and obtain its users' consent where required by law.[78]

142. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pinterest Tag, and ignored Pinterest's warnings to safely handle its users' data and to warn its users that the Website would disclose information in a manner that threatened users' private Sensitive Information.

**K. The Snap Pixel**

143. Defendant also installed code on the Website created by Snapchat that tracks Website visitors, actions, behavior, and conversions across the Website (the "Snap Pixel").

144. The Snap Pixel is a piece of JavaScript code provided by Snapchat that allows advertisers, such as Defendant, to track user actions and behavior on websites for the purpose of measuring ad performance, optimizing ad campaigns, and building targeted audiences for better advertising results.[79]

---

[77] *See Developer and API Terms of Service*, PINTEREST, https://developers.pinterest.com/terms/ (last visited Nov. 3, 2026).

[78] *See id.*

[79] *See Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Nov. 3, 2026); *see also Snapchat Pixels*, SPRINKLR, https://www.sprinklr.com/help/articles/snapchat-pixel/snapchat-

145. To make use of the Snap Pixel, Defendant must create a Snapchat Ads manager account, create a pixel, receive a Pixel ID, select the information to be collected, follow specific guides for integration with third party software like Spotify or Google Tag Manager, and determine whether to enable automated matching for the Snap Pixel.[80]

146. "For the Pixel to work, [Snapchat] need[s] to receive a Pixel ID and a standard event type" at a minimum.[81]

147. The Pixel ID is an "[a]dvertiser specific ID,"[82] where the Pixel ID is used to initialize the Snap Pixel's tracking,[83] identifying which advertising account receive the collected data.

148. This software may be automatically or manually added to a website's webpages, but in either case, the software must be added to each webpage being tracked.[84]

---

pixels/640739d87517d84a3aaf2d26 (last visited Nov. 3, 2026); Marialuisa Aldeghi, *How to Set Up the Snap Pixel: A Step-by-step Guide*, LEADSBRIDGE (Dec. 18, 2024) https://leadsbridge.com/blog/snap-pixel/ (last visited Nov. 3, 2026).

[80] *See Getting Started with Enabling the Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-website-install?language=en_US (last visited Nov. 3, 2026).

[81] *Pixel Implementation FAQs*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-faq?language=en_US (last visited Nov. 3, 2026).

[82] *See Snap Pixel Helper Glossary*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-helper-glossary?language=en_US (last visited Nov. 3, 2026).

[83] *See About Snap Pixel*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/snap-pixel-about?language=en_US (last visited Nov. 3, 2026).

[84] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Nov. 3, 2026).

149. Key features of the Snap Pixel include tracking user actions ("events") designated by advertisers, such as page views, add-to-cart actions, purchases, and sign-ups.[85] Advertisers, such as Defendant, can add additional parameters to these events for more granular insights, like purchase value or product type information.[86] The information is collected immediately as users land on the website where the pixel is installed.[87]

150. The Snap Pixel also allows cross-device tracking, enabling tracking across multiple devices to provide a comprehensive view of a customer's journey.[88]

151. The Snap Pixel collects:

a. The time the website actions occurred;[89]

b. Device information such as the hardware model, operating system, and browser type used;[90]

c. Cookies;[91]

d. Metadata such as button clicks, time spent on the site, conversations and page visits;[92] and

---

[85] *See Pixel Event Examples*, SNAPCHAT, https://businesshelp.snapchat.com/s/topic/0TO8b000000P8xxGAC/pixel-event-examples?language=en_US (last visited Nov. 3, 2026).

[86] *See Additional Parameters Example*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/additional-parameters?language=en_US (last visited Nov. 3, 2026).

[87] *See Using the Snap Pixel*, *supra* note 79; *see also* Aldeghi, *supra* note 79.

[88] *See About Snap Pixel*, *supra* note 83.

[89] *See Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Nov. 3, 2026).

[90] *See Privacy Policy*, SNAP INC. (last updated Sept. 21, 2026), https://values.snap.com/privacy/privacy-policy (last visited Nov. 3, 2026).

[91] *See Cookie Information*, SNAP INC. (last updated Aug. 14, 2026), https://www.snap.com/privacy/cookie-information (last visited Nov. 3, 2026).

[92] *See Set Up Snap Pixel*, TAGGRS, https://taggrs.io/docs/server-side-tracking/snapchat/snap-pixel (last visited Nov. 3, 2026).

e. IP addresses for general geographic data.[93]

152. The Snap Pixel enables website owners, such as Defendant, to understand how users navigate to their website. This data helps website owners, such as Defendant, refine their advertising strategies by identifying high-performing campaigns and optimizing ad spending.[94]

153. The Website's Snap initialization code, and Snap Pixel event activations, transmit Defendant's Pixel ID in the form of a URL parameter named "pid", which contains Defendant's Snap Pixel ID value of "c7a80334-a6e7-4634-b4e6-5e212985ca87". This data is sent both when receiving communications from the Website and as users to send communications to the Website.

154. Snap also independently benefits from non-customer list audience information.[95]

155. The harvested data collected by the Snap Pixel is used by Defendant to create custom audiences.[96] Defendant can retarget users who viewed specific pages or made purchases and build lookalike audiences to reach new users with similar characteristics.[97]

156. Put simply, the Snap Pixel collects as much data as it can about otherwise anonymous visitors to the Website and matches it with existing data Snapchat has acquired and accumulated about millions of Americans to improve Defendant's conversion rates and reduce overall advertising costs.

---

[93] *See Directly Implement the Pixel On Your Website*, SNAPCHAT, https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US (last visited Nov. 3, 2026).

[94] *See* Aldeghi, *supra* note 79.

[95] *See Privacy Policy*, *supra* note 90.

[96] *See* Aldeghi, *supra* note 79.

[97] *See id.*

157. The Snap Pixel requires advertisers, such as Defendant, to integrate code into their website's header or to use tools like Google Tag Manager for a seamless setup.[98]

158. Advertisers, such as Defendant, are encouraged to use tools like Snap Pixel Helper to verify proper installation, ensure accurate event tracking and track user activity.[99]

159. Defendant, through the Snap Pixel, uses data and cookies to track users and serve them relevant ads on Snapchat based on how they interacted with the Website.[100] The data received from Snapchat conversion tracking allows Defendant to serve highly targeted ad campaigns to the right people.[101]

160. Using the Snap Pixel helps Defendant collect important information about its customers (and prospective customers) so that Defendant, in turn, can benefit financially. Snapchat advertises the Snap Pixel as including "key benefits," such as:

a. **Measuring conversion events that matter**: See all the actions that take place on your site, across all devices, and attribute conversions back to your ad campaigns to understand their true impact.

b. **Reaching the perfect audience**: Create Pixel Custom Audiences and Lookalike Audiences based on the specific actions Snapchatters have taken while visiting your site.

---

[98] *See id.*

[99] *See Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel (last visited Nov. 3, 2026).

[100] *See id.*

[101] *See id.*

> c. **Optimize campaigns to reach people most likely to take action**: Use real-time insights to optimize delivery of your campaigns for results that matter most to your business.[102]

161. An image of the invasive Snap Pixel code secretly embedded on Defendant's Website can be seen here:




*Figure 14 - Snap Pixel active on the Website*

162. When the Snap Pixel triggers, it captures the relevant data and sends a transmission to Snapchat's servers as depicted in the picture above, which shows Defendant's Snap Pixel instantly sending communications to Snapchat as users take certain actions on the Website, like viewing a webpage.

163. The Snap Pixel's functionality is not disclosed on the Website.

---

[102] *Benefits of Using the Snap Pixel*, SNAPCHAT (July 11, 2023), https://forbusiness.snapchat.com/blog/the-snap-pixel-how-it-works-and-how-to-install-it (last visited Nov. 3, 2026) (emphasis in original).

164. By using the Snap Pixel and providing Snapchat with users' information, Defendant had to agree to Snapchat's Personal Data Terms (the "Snap Terms"), among other agreements governing the use of the Snap Pixel.

165. By agreeing to the Snap Terms, Defendant represented and warranted that the personal data it shares with Snapchat will not contain any information about individuals under the age of 13 or any sensitive information or special category data.[103]

166. The Snap Terms further require Snap Pixel users, such as Defendant, to secure and maintain "all necessary rights, licences [sic] and consents required to provide or make available the personal data" shared through the Snap Pixel.[104]

167. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from the use of the Snap Pixel, and ignored Snapchat's warnings to safely handle its users' data and to warn its users that the Website would disclose their Sensitive Information in a manner that violated their right to privacy.

**L. The Trade Desk Pixel**

168. The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[105] The Trade Desk provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and

---

[103] *See Personal Data Terms*, SNAP INC. (last updated June. 30, 2025), https://www.snap.com/terms/personal-data#:~:text=In%20summary%3A%20you%20provide%20a,information%3B%20you%20obtained%20any%20necessary (last visited Nov. 3, 2026).

[104] *Id.*

[105] *See What Is a Demand-side Platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Nov. 3, 2026).

inventory sources.[106] As a DSP, The Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites.[107] The Trade Desk is "integrat[ed] with many SSPs that rely on the advertising spend generated from The Trade Desk's advertisers."[108]

169. As to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of The Trade Desk, described Trade Desk's Unified ID 2.0 marketing technology as having "effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[109]

170. Among the tracking technologies offered by The Trade Desk and employed by the Website for tracking user behavior and collecting data for targeted advertising is the Trade Desk Universal Pixel (the "TD Pixel").[110] The TD Pixel is enabled by placing the TD Pixel code within a website's code, which enables the

---

[106] *See About Us*, THETRADEDESK, https://www.thetradedesk.com/about-us (last visited Nov. 3, 2026).

[107] *See What Is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Nov. 3, 2026).

[108] Trey Titone, *The Trade Desk OpenPath and The Future of SSPs*, AD TECH EXPLAINED (Feb. 21, 2022), https://www.adtechexplained.com/p/the-trade-desk-open-path-explained/ (last visited Nov. 3, 2026).

[109] Chris Kelly, *Trade Desk Revenue Up 24% As Advertisers Continue Shift to CTV, Retail Media*, MARKETINGDIVE (Feb. 15, 2023), https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Nov. 3, 2026).

[110] *See The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Nov. 3, 2026).

capture of data on each page of the website and across multiple websites.[111] The TD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[112]

171. The TD Pixel, like other pixels, is a tracking tool that can be integrated with the Trade Desk's platform (the "TD Platform"). The TD Pixel allows advertisers and site operators to "spend less time and effort placing tags, gain more visibility into user data, and analyze reporting at a more granular level . . . all with the placement of [a] single tag."[113] The TD Pixel, like other pixels, collects information, including demographics, browsing behavior, and conversion events.[114] The precise categories of information collected through the TD Pixel in this case are described in further detail below. The TD Pixel is not limited to computer or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[115]

---

[111] *See Universal Pixel*, OPENTTD, https://open.thetradedesk.com/advertiser/docsApp/GuidesAdvertiser/data/doc/TrackingTagsUniversalPixel (last visited Nov. 3, 2026).

[112] *See* Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024), https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Nov. 3, 2026).

[113] *Universal Pixel*, THETRADEDESK (2016), https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Nov. 3, 2026).

[114] *See* Erin Jeffery, *What Are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020), https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Nov. 3, 2026).

[115] *See Privacy and The Trade Desk Platform*, THETRADEDESK (last updated Mar.13, 2026), https://www.thetradedesk.com/us/privacy (last visited Nov. 3, 2026).

172. An advertiser or website operator that uses the TD Platform to run campaigns can leverage the TD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[116]

173. Defendant's integration of the TD Pixel provides benefits to both the Trade Desk and Defendant.

174. The first benefit provided by the TD Pixel to The Trade Desk is data collection. This data allows The Trade Desk to segment user information to create target audiences and track conversions.[117] For example, the TD Pixel enables The Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[118] This data is then sent to a SSP, which analyzes bids from multiple DSPs, such as The Trade Desk, and facilitates the targeting of users based on their information.[119] The Trade Desk relies on this information for its business operations.

175. The TD Pixel also enables the Trade Desk to retarget users by creating lookalike audiences, as the TD Pixel is "essentially [] just storing a group of people and information about them."[120] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[121] By developing lookalike audiences, the Trade Desk enhances its ability to bid for advertising space from SSPs by identifying

[116] *See id.*
[117] *See* Jeffery, *supra* note 114.
[118] *See Privacy and The Trade Desk Platform*, *supra* note 115.
[119] *See Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Nov. 2, 2026).
[120] Jeffery, *supra* note 114.
[121] *See id.*

website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[122]

176. Finally, because the Trade Desk's primary business model involves charging clients or advertising publishers a percentage of gross spending on the Trade Desk platform, improvements in advertising effectiveness increase Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales),[123] advertisers are more likely to shift additional business to the Trade Desk, resulting in increased revenue derived from ad sales. [124]

177. On Defendant's Website, the TD Pixel is configured to intercept search terms after a user submits those terms through the search engine and before the resulting search responses are transmitted to and loaded on the user's device, as depicted below, thereby capturing the contents of the user's search communications in transit:[125]




*Figure 15 – Inputting Search Terms into the Search Bar results in the TD Pixel Intercepting the Search Terms*

---

[122] *See id.*

[123] *See What Is a Conversion Rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Nov. 3, 2026).

[124] *See* Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 AM), https://www.fool.com/investing/2021/10/27/how-does-the-trade-desk-make-money/ (last visited Nov. 3, 2026).

[125] Here, a test search was conducted using "blue jeans" as the search term.

**M. Bazaarvoice Pixel**

178. Defendant has also installed a pixel created by the ratings and review platform Bazaarvoice.

179. Bazaarvoice's main business is implementing review platforms on websites, allowing website owners to easily manage and track reviews for their products.[126]

180. However, Bazaarvoice also offers website owners Bazaarvoice Analytics integration, also known as the BV Pixel. The BV Pixel allows website owners to collect and monitor the behavior of users on their website.[127]

181. The BV Pixel can capture a variety of user events, such as when a user purchases a product, interacts with Bazaarvoice user reviews, or views a webpage containing Bazaarvoice content, such as a product page with reviews.[128]

182. The BV Pixel also intercepts personally identifiable information when the website owners configure it to do so. When a user triggers a transaction or conversion event, the BV Pixel can send the user's email address, locale, nickname, and "userId."[129]

---

[126] *See About Bazaarvoice,* BAZAARVOICE, https://www.bazaarvoice.com/company/ (last visited Nov. 10, 2026).

[127] *See Introduction to BV Pixel*, BAZAARVOICE (last updated Nov. 5, 2026), https://docs.bazaarvoice.com/articles/ratings-reviews/introduction-to-bv-pixel (last visited Nov. 10, 2026).

[128] *See id.*

[129] *See PII Integration & Security*, BAZAARVOICE (last updated Nov. 5, 2026), https://docs.bazaarvoice.com/articles/ratings-reviews/personally-identifiable-information-integration-security (last visited November 10, 2026).

183. Bazaarvoice also uses cookies to consistently track users when they visit a website. These cookies are first-party cookies, as they are placed by the website, and allow Bazaarvoice to track and identify users.[130]

184. Two cookies that are used by Bazaarvoice to track users are the BVBRANDID cookie, which persists for one year, and the BVBRANDSID cookie, which persists for the user's browsing session.[131]

185. Bazaarvoice warns website owners that "[t]hese cookies can only be set if the site visitor has given consent through a cookie consent panel on your website."[132]

186. Bazaarvoice shares the collected data, as permitted by the customer, with all other Bazaarvoice customers.[133] All user data is therefore aggregated with data from other websites and shared with numerous other parties.

187. Defendant's use of the BV Pixel on the Website can be seen in the figures below.




*Figure 16 – The BV Pixel on the Website*

---

[130] *See Bazaarvoice Cookies*, BAZAARVOICE (last updated Nov. 6, 2026), https://docs.bazaarvoice.com/articles/#!portal-basics/cookies/q/session/qp/1/qid/239076 (last visited Nov. 10, 2026).

[131] *See id.*

[132] *See id.*

[133] *See FAQ: BV Pixel Security, Performance & Strategy*, BAZAARVOICE (last updated Nov. 5, 2026), https://docs.bazaarvoice.com/articles/ratings-reviews/faq-bv-pixel-security-performance-strategy (last visited November 10, 2026).




*Figure 17 – The Payload for the BV Pixel on the Website*

188. These figures show that Defendant implemented the BV Pixel on the Website, which intercepted and transmitted the contents of users' communications with the Website, along with identifying cookies, to Bazaarvoice.

189. Defendant intentionally placed the Bazaarvoice identifying cookies on the Website, as shown in the figure below.

Filter | Only show cookies with an issue

| Name | Value | Domain | Pa... | Expire... | Size | HttpO... | Secure | SameS... | Partiti... |
|---|---|---|---|---|---|---|---|---|---|
| _twpid | tw.1774294474659.124564192521096454 | .royalcaribbean.com | / | 2027-... | 41 | | ✓ | Strict | |
| _uetsid | 4cbdfbc026ef11f18d1a7964ab2c4319 | .royalcaribbean.com | / | 2026-... | 39 | | | | |
| _uetvid | 4cbe335026ef11f1891cb7dee0fd7169 | .royalcaribbean.com | / | 2027-... | 39 | | | | |
| ADRUM | s=1774294523041&r=https%3A%2F%2Fww... | .royalcaribbean.com | / | Session | 76 | | ✓ | Lax | |
| ak_bmsc | 867C14E29852DB19DC86A9DE520208DC~0... | .royalcaribbean.com | / | 2026-... | 567 | ✓ | | | |
| AKA_A2 | A | .royalcaribbean.com | / | 2026-... | 7 | ✓ | ✓ | | |
| AMCV_981337045329... | 1585540135%7CMCIDTS%7C20536%7CMC... | .royalcaribbean.com | / | 2027-... | 280 | | | | |
| AMCVS_98133704532... | 1 | .royalcaribbean.com | / | Session | 42 | | | | |
| at_check | true | .royalcaribbean.com | / | Session | 12 | | ✓ | None | |
| bm_mi | DFCAC352301E36F2298D784A0CD35227~Y... | .royalcaribbean.com | / | 2026-... | 376 | | ✓ | | |
| bm_sv | 56400980AE133C21C2D667A31DB134C2~Y... | .royalcaribbean.com | / | 2026-... | 308 | | ✓ | | |
| bm_sz | A419F70426777264E38AC69595B20F4A~YA... | .royalcaribbean.com | / | 2026-... | 494 | | | | |
| BVBRANDID | 092c0c1e-e39f-4ccd-8412-5b3ea46362a1 | .royalcaribbean.com | / | 2027-... | 45 | | ✓ | | |
| BVBRANDSID | 2ae9a28a-df5a-4664-a43d-e7872cdcb761 | .royalcaribbean.com | / | 2026-... | 46 | | ✓ | | |
| cmCampaign | Direct | .royalcaribbean.com | / | 2026-... | 16 | | | | |
| cmChannel | Direct | .royalcaribbean.com | / | 2026-... | 15 | | | | |
| country | USA | .royalcaribbean.com | / | Session | 10 | | ✓ | | |
| departureDate | 2026-05-01 | .royalcaribbean.com | / | 2027-... | 23 | | | | |
| gpv_pn | aem%3Acruises%3Aitinerary | .royalcaribbean.com | / | 2026-... | 31 | | | | |
| language | en | .royalcaribbean.com | / | Session | 10 | | | | |
| LPSID-51532229 | 3wkY_FTOT8GQVTMDheAeHA | .royalcaribbean.com | / | Session | 36 | | | | |
| LPVID | hjYTA0MWQ1YTBiZDExZTgz | .royalcaribbean.com | / | 2027-... | 27 | | | | |
| mbox | session#4e8bb839ba1044e5a89a866f5268c7... | .royalcaribbean.com | / | 2027-... | 107 | | ✓ | None | |

*Figure 18 – First-party cookies placed by Defendant on the Website, including the BV Pixel cookies*

190. Figure 18 shows the Website placing the BVBRANDID and BVBRANDSID first-party cookies, allowing Bazaarvoice to track individual users on the Website.

191. Bazaarvoice admits that it shares users' Sensitive Information with third parties,[134] just as Plaintiffs' Sensitive Information was shared here.

192. Bazaarvoice uses Plaintiffs' Sensitive Information for their own purposes, including improving their services and analyzing the data for analytics.

193. Bazaarvoice educates or reminds BV Pixel users of their obligation to be honest with their consumers and to "maintain a privacy policy that accurately

---

[134] *See Bazaarvoice, Inc. Main Services Agreement*, BAZAARVOICE (last updated Sept. 2024), https://media2.bazaarvoice.com/agreements/bazaarvoice-msa-5.3.1.pdf (last visited Nov. 10, 2026).

reflects your use of the content received, retrieved, accessed, and transferred through the Bazaarvoice API."[135]

194. As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the BV Pixel and ignored Bazaarvoice's warning to warn its users that the Website would disclose their information in a manner that threatened their Sensitive Information.

**N. The Tracking Tools Listed Above Intercepted and Disclosed Both the Contents of Plaintiffs' Communications With the Website, As Well as Their Personal Identifiers.**

195. When Plaintiffs searched for various travel destinations across the country (including Los Angeles, Miami, and Port Canaveral), different rooms and rates, and travel packages offered by Defendant , the Tracking Tools contemporaneously intercepted the searches for specific locations ranging from across the United States to Mexico, for specific rooms on ships, and for different travel packages which is reflected and can be seen in the Request URLs transmitted to the Tracking Entities. The path and query string of these Request URLs reflect the substance of a user's communication and therefore constitute content.

196. The Tracking Tools also intercepted and disclosed Plaintiffs' and Defendant's IP addresses, Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified the Plaintiffs.

197. This interception, duplication, and transmission occurred inside Plaintiffs' browsers, before the communications fully reached users' devices, or before they were transmitted from users' devices, and therefore occurred while the communications were in transit, intercepted, read, duplicated, and retransmitted by

---

135 *API Terms of Use*, BAZAARVOICE (last updated Aug. 2026), https://www.bazaarvoice.com/legal/terms-of-use/api/ (last visited Nov. 10, 2026).

the Tracking Entities, who were third parties to Plaintiffs' communications with Defendant.

**O. Plaintiffs Did Not Consent to Third-Party Tracking**

198. First, counsel's investigation revealed that the Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could click "Manage Preferences" on the Privacy Banner or use the "Functional Cookies" and "Do Not Sell My Information" toggles and click "Confirm My Choices" in the Cookie Settings to manage their cookie selections.

199. Second, even when Plaintiffs declined all but strictly necessary Tracking Tools when confronted with the Privacy Banner and Cookie Settings, Defendant placed, and allowed to be placed, the BVBRANDID and BVBRANDSID cookies from Bazaarvoice which [PLACEHOLDER: WHAT THE BAZAARVOICE COOKIES DID AFTER PLAINTIFFS DECLINED]

200. When Plaintiffs declined all but strictly necessary Tracking Tools they relied on Defendant's representation that such selection would disable marketing and tracking technologies and continued to browse and use the Website in reliance of that representation.

201. Figure 4 and Figure 5 are exemplar images taken during counsel's investigation of the Website.

202. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered actual damages, including the loss of control over their personal information and the diminution in value of that information.[136]

---

[136] *See Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021) (finding that "[p]laintiffs 'have suffered harm in the form of diminution of the value of their private and personally identifiable data and content'" through defendant's collection of plaintiffs' data); see also *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "plaintiffs

Plaintiffs' and the Class members' Sensitive Information has concrete economic value, as shown by the robust market in which such data is bought, sold, and licensed.[137] Through its Cookie Settings, Defendant represented that users could decline non-essential tracking, thereby preserving the security and value of their Sensitive Information. Plaintiffs relied on that representation and affirmatively declined. By facilitating Bazaarvoice's interception, collection, and transmittal of Plaintiffs' Sensitive Information to Bazaarvoice, regardless of Plaintiffs' affirmative rejection of all but strictly necessary cookies, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiffs of the ability to decide whether, when, to whom, and on what terms their Sensitive Information would be shared and/or sold.

203. Plaintiffs value the privacy and exclusivity of their Sensitive Information. It is plausible, and indeed likely, that Plaintiffs would at some point have monetized their data by selling or licensing it through one of the many available channels.[138] Defendant's unauthorized dissemination has foreclosed or diminished that opportunity, because data that has already been captured and

---

who suffered a loss of their personal information suffered economic injury" and had standing sufficient to satisfy statutory requirements of economic injury).

[137] *See* Order Denying Google's Mot. for Summ. J. at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb Lets You Sell Your Data to AI Labs for Training*, AXIOS (Aug. 6, 2026), https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (last visited Nov. 5, 2026) (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New wallet app lets users store their own training data*, AXIOS (Sept. 22, 2025), https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (last visited Nov. 5, 2026) (similar).

[138] *See* Mills, *supra* note 137; *see also* Morrone, *supra* note 137.

distributed to third parties without restriction commands a lower price, or no price at all, in that market. Plaintiffs therefore lost the benefit of their bargain, lost the exclusive value of their Sensitive Information, and did not receive the privacy protections Defendant promised.

204. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[139] Because Defendant and its third-party partners have already obtained Plaintiffs' information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiffs.

## TOLLING

205. The statutes of limitations applicable to Plaintiffs' and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiffs' and the Class members' delayed discovery of their claims. Defendant's acts were technically complex, and inherently self-concealing, thereby preventing Plaintiffs and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

206. Defendant, via its Cookie Settings, misrepresented its data sharing practices.

207. Defendant possessed superior and exclusive knowledge that the Tracking Entities would disclose Plaintiffs' and Class members' Sensitive Information in contradiction to Plaintiffs' cookie settings preferences.

208. Plaintiffs and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and

[139] *See* Mills, *supra* note137; *see also* Morrone, *supra* note137.

misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

209. Plaintiffs and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, in or around November of 2026.

## CLASS ALLEGATIONS

210. Plaintiffs bring these claims for relief pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

211. Plaintiffs bring this class action individually and on behalf of the following Class:

> All persons in the United States who visited the Website during the applicable limitations period and declined cookies other than Required Cookies on the Website's Cookie Settings (the "Class").

212. Plaintiffs bring this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website during the applicable limitations period while located in the State of California (the "California Subclass").

213. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

214. Plaintiffs reserve the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

215. NUMEROSITY: At this time, Plaintiffs do not know the number of Class members but believe the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by the Defendant in the ordinary course of its business.

216. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant's conduct constitutes unlawful intrusion upon seclusion;

e. Whether Defendant's conduct constitutes fraud;

f. Whether Defendant has been unjustly enriched by its conduct; and

g. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

217. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass. Such common legal and factual questions, which do not vary between the California Subclass members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the CIPA; and

b. Whether Defendant's conduct constitutes a violation of the California Constitution.

218. TYPICALITY: As persons who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiffs are asserting claims that are typical of the Class members.

219. ADEQUACY: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

220. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will

unjustly retain improperly obtained revenues, or will otherwise escape liability for their wrongdoing as asserted herein.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF THE WIRETAP ACT 18 U.S.C. § 2510 et seq.

## (On Behalf of Plaintiffs and the Class)

221. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

222. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

223. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

224. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

225. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

226. The Wiretap Act defines "contents" as including "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

227. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

228. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

229. Plaintiffs, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

230. The Tracking Tools, Plaintiffs' devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

231. Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including the pages they viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all non-required cookies.

232. Within the relevant time period, Plaintiffs' electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiffs' consent from Plaintiffs' browser, for the unlawful purpose of monetizing the Plaintiffs' intercepted information, including for combining that information with information collected about Plaintiffs from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

233. Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, viewed content, or otherwise communicated information to the Website through their browsers.

234. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing

so would result in the interception and transmission of users' communications to the Tracking Entities.

235. Plaintiffs did not consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. To the contrary, Plaintiffs affirmatively declined Tracking Entities' tracking through Defendant's Cookie Settings.

236. The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a).

237. Defendant intentionally procured the Tracking Entities' interception of the contents of Plaintiffs' and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiffs' and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiffs and the Class members on its Website.

238. Additionally, Plaintiffs' communications were fraudulently disclosed and were obtained and used based on misrepresentations to Plaintiffs through the Cookie Settings.

239. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

240. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT II**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

241. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

242. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

243. CIPA was enacted to curb "the invasion of privacy resulting from the continual and increasing use of" certain technologies determined to pose "a serious threat to the free exercise of personal liberties." Cal. Penal Code § 630. CIPA extends civil liability for various means of surveillance using technology.

244. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line,

cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a); *see also* Cal. Penal Code § 637.2(a).

245. The Website, the Tracking Tools, and Plaintiffs' devices and browsers each qualify as a "machine, instrument, or contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code § 631(a).

246. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and the California Subclass members, contemporaneous with the communications transit through or passing over any wire, line or cable or with the communications sending from or being received at any place within California.

247. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

248. Plaintiffs and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic

communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiffs and the California Subclass members' respective rights to privacy.

249. As a direct and proximate result of Defendant's conduct, Plaintiffs and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. I, § 1**
**(On Behalf of Plaintiffs and the California Subclass)**

250. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

251. Plaintiffs bring this cause of action on behalf of themselves and all California Subclass members.

252. Article I, Section 1 of the California Constitution provides: "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.California voters added the word "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, Assemblyman Kenneth Cory and State Senator George Moscone stated: "[t]he right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of

personal information. This is essential to social relationships and personal freedom."[140]

253. Plaintiffs and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

254. Plaintiffs and California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."[141]

255. The privacy rights of Plaintiffs and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiffs and the California Subclass members.

256. Plaintiffs and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and Tracking Entities to be placed on users' browsers and devices and by transmitting users' Sensitive Information to Bazaarvoice after users declined cookies other than Required Cookies on the Website's Cookie Settings, Defendant violated their reasonable expectation of privacy.

257. Defendant's intrusion, placing third-party Tracking Tools and enabling Bazaarvoice's access to users' Sensitive Information despite users'

[140] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11 27.
[141] *Id.*

express rejection of such tracking, is and would be highly offensive to a reasonable person.

258. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiffs and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

**COUNT IV**
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class)**

259. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

260. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

261. Defendant intentionally intruded upon the legally protected privacy interests of Plaintiffs and the Class members by, among other things, permitting Tracking Tools to intercept and use users' Sensitive Information by compiling it with other user information gathered across the internet, while representing to users that they could decline such collection.

262. Plaintiffs and Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[142] Plaintiffs expected that their interactions with the Website would not be shared with third-party analytics providers.

---

[142] For example, California voted to pass the California Consumer Privacy Act of 2018 (the "CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (the "CPRA"). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet

263. Defendant's intrusion, placing the Tracking Tools and enabling Bazaarvoice's access to users' Sensitive Information despite users' express rejection of such tracking, is and would be highly offensive to a reasonable person.

264. Plaintiffs and Class members relied on Defendant's representations and exercised the Website's controls, having declined cookies other than Required Cookies on the Website's Cookie Settings, reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline unnecessary cookies.

265. Despite Plaintiffs' and the Class members' affirmative rejection of unnecessary cookies, Defendant permitted Bazaarvoice to use cookies to collect and compile users' Sensitive Information, including the categories described above.

266. Defendant lacked any legitimate business justification for permitting the placement and transmission of cookies from Bazaarvoice that allowed Bazaarvoice to access, intercept, and collect users' Sensitive Information, contrary to users' express selections and rejection of consent.

267. As a direct and proximate result of Defendant's conduct, Plaintiffs and the Class members suffered injury, including but not limited to loss of privacy, loss of control over their personal information, diminution in value of their private data, and other compensable harms.

268. Plaintiffs and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available.

---

browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

## COUNT V
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiffs and the Class)

269. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

270. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

271. Defendant made affirmative representations to users through its Privacy Banner and Cookie Settings that users could decline all non-necessary cookies. A user who clicked "Manage Preferences" on the Privacy Banner was shown the Cookie Settings, headed "Manage Consent Preferences," where Defendant stated: "With the exception of Required Cookies, you may opt out of individual categories of Cookies using the toggle next to each category and/or the sale/sharing of personal information by using the DO NOT SELL/SHARE MY PERSONAL INFORMATION toggle." The Cookie Settings also stated: "In these instances, We provide you the opportunity to disable such Cookies via the Cookie Preferences herein." Defendant also offered users the "Functional Cookies" and "Do Not Sell My Information" toggles and a "Confirm My Choices" button in the Cookie Settings.

272. Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including analytics and marketing cookies, and would limit the transmission of users' Sensitive Information to the Tracking Entities.

273. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences.

274. These representations were false and misleading. Before users, including Plaintiffs and the Class members, were able to decline all unnecessary

cookies, Defendant deployed the Tracking Tools to intercept and collect Plaintiffs' and the Class members' Sensitive Information and transmit the same to the Tracking Entities. After users declined cookies other than Required Cookies on the Website's Cookie Settings, Bazaarvoice continued to intercept and transmit users' data.

275. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools functionality, which would have alerted Defendant to decreased information intake if the Website's Privacy Banner and Cookie Settings were functioning as described and stopped transmitting data when users rejected cookies.

276. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

277. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data through Bazaarvoice for its own commercial benefit.

278. Plaintiffs and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by affirmatively rejecting all but strictly necessary cookies instead of avoiding the Website, withholding information, or taking additional steps to protect their

privacy. Plaintiffs engaged with Defendant's Cookie Settings and declined all but strictly necessary Tracking Tools, relying on Defendant's representations that such selection would disable marketing and tracking technologies.

279. Plaintiffs' and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

280. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data. Plaintiffs and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

281. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing, through Bazaarvoice, to collect, use, and monetize users' Sensitive Information despite representing that such practices would cease upon users' declination and/or rejection of consent.

282. Plaintiffs and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, and punitive damages where available.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

283. Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

284. Plaintiffs bring this cause of action on behalf of themselves and all Class members.

285. Defendant obtained a benefit by collecting, processing, and enabling third-party monetization of Plaintiffs' and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

286. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

287. Plaintiffs and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and the Class members are entitled to the relief set forth below.

## PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and the California Subclass, and certifying Plaintiffs as the representatives of the Class and the California Subclass and their counsel as Class Counsel;

b. For an order finding in favor of Plaintiffs, the Class, and the California Subclass, on all counts asserted herein;

c. An award of statutory damages or penalties to the extent available;

d. An award of punitive damages to the extent available;

e. For damages in amounts to be determined by the Court and/or jury;

f. For pre-judgment interest on all amounts awarded;

g. For an order of restitution and all other forms of monetary relief;

h. An award of all reasonable attorneys' fees and costs; and

i. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 16, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Jason M. Ingber*

Jason M. Ingber (SBN 318323)
3580 Wilshire Boulevard, Suite 1260
Los Angeles, California 90010-2513
Telephone: (213) 805-8373
Email: jingber@zlk.com

Mark S. Reich*
Christopher V. DeVivo*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming